## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**REGINALD DRAUGHON,**

      **Petitioner,**

    **v.**                      **Case No. 2:04-cv-843**
                                      **JUDGE GRAHAM**
**PAT HURLEY, Warden,**           **Magistrate Judge ABEL**

      **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

### I.  FACTS

This case involves the following facts, as summarized by the Tenth District Court of Appeals:

> At trial, the state called only two witnesses, Kieauna Fuqua ("Kieauna"), the victim of the crimes, and Gail Hornor ("Hornor") a pediatric nurse practitioner, who testified as an expert witness regarding an examination that she performed on Kieauna on August 18, 1999.
>
> Kieauna was 16 years of age when she testified at trial. She was by then a sophomore high school student. She testified that she first met defendant during the summer of 1993 when he began dating her mother, Mary White ("White"). At that time, Kieauna was seven years old. In the summer of 1993, Kieauna, her mother, and Kieauna's brother and sister resided at Kieauna's grandmother's house. Kieauna's brother was three years old, and her sister was one year old

at that time.

Kieauna testified that her first sexual encounter with defendant occurred during the summer of 1993 before school had started. She was upstairs watching television in her grandmother's bedroom, and so was defendant. Everyone else who lived there were downstairs in the kitchen. Initially, Kieauna and defendant were on the floor watching television. Then Kieauna got up to lay on her grandmother's bed. She was laying on her stomach under a blanket facing the television. Defendant put his hand underneath the blanket and starting rubbing Kieauna's "butt." (Tr. 29.) Upon hearing her mother ascending the stairs, Kieauna moved to the floor, and defendant got up and went downstairs. Later, defendant asked Kieauna if she liked it, and Kieauna told defendant "no." This incident, which we shall call the first incident, relates to count one of the indictment which alleges gross sexual imposition of which defendant stands convicted.

About two or three months after the first incident, Kieauna's mother and defendant obtained an apartment on the east side of Columbus. Kieauna, her mother, defendant, and Kieauna's younger brother and sister all moved to the apartment. This is where the second incident of sexual conduct occurred. Kieauna testified that it occurred in October of 1993 around Halloween. (Tr. 34.) Kieauna was laying on the living room floor watching television, and defendant was behind her also watching television. Kieauna's sister was also in the living room sleeping. Kieauna's mother was probably upstairs at the time. Defendant asked Kieauna if she "wanted to play a game," and Kieauna said "sure, why not." (Tr. 34.) Defendant then removed her pajamas and underwear and had vaginal intercourse with her. Afterward, defendant told Kieauna not to tell anyone and especially her mother because she would be jealous and upset. Defendant then went upstairs and Kieauna stayed downstairs and went to sleep. Kieauna did not tell anyone about this incident until many years later. This incident relates to count two of the indictment charging defendant with rape upon which he stands convicted.

The third incident which Kieauna described at trial relates to count five of the indictment alleging gross sexual imposition. The jury returned a verdict of not guilty as to count five. Kieauna testified that the third incident occurred about two or three days after the rape that had previously occurred. According to Kieauna's testimony, she was sitting on a couch with a blanket over her while watching television. Her mother was sitting in the same room on another couch, also watching television. Defendant came into the room and sat beside Kieauna and put the blanket over himself. According to Kieauna,

2

defendant then took her hand, which was underneath the blanket, and placed it on his penis. According to Kieauna, her mother continued to watch television while this was going on.

The fourth incident, which Kieauna described at trial, relates to count three of the indictment charging defendant with rape. The jury returned a not guilty verdict as to count three. Kieauna testified that the fourth incident occurred a few days after the previous incident. According to Kieauna, she had fallen asleep downstairs late at night after watching television. Kieauna stated that defendant woke her up and said, "we were going to try something new." (Tr. 43.) Kieauna testified that defendant had a small container of Vaseline with him and "he rubbed it on my anal and he entered me with his penis." (Tr. 44.) Kieauna further testified that defendant then forced her to put her mouth on his penis.

At this point in Kieauna's direct examination, the following exchange occurred:

Q. [STATE]: Through all of the sexual contact that you have described that has happened up to this point, had you had any sexual contact with any other person?

A. [KIEAUNA]: No, I did not, never.

Q. [STATE]: No one, other than Mr. Draughon, had penetrated you vaginally?

[DEFENSE COUNSEL]: Objection. May we approach, your Honor?

(Tr. 47.)

Defendant's counsel then asserted to the court that "the state is violating the rape shield statute as to prior sexual contact." *Id.* The court overruled defendant's objection. The exchange continued:

Q. [STATE]: You can answer the question. No one had penetrated you vaginally?

A. [KIEAUNA]: No.

(Tr. 48.)

The fifth incident described by Kieauna relates to count six of the

3

indictment of which defendant stands convicted. Kieauna testified that this incident occurred "weeks later" when she was upstairs in the bathroom after just taking a bath. (Tr. 48.)

As Kieauna was putting on her clothes, defendant knocked on the bathroom door, stating that he had to use the bathroom. He then pushed the door open, came into the room, and, using his fingers, penetrated her vagina. Kieauna heard her mother's footsteps moving toward the bathroom. At that point, defendant pulled his fingers out and started washing his hands. Kieauna remembered that this incident occurred around Christmas of 1993 because defendant had given her a Christmas gift that she wanted very much. (Tr. 54.)

Kieauna testified about another incident that she said occurred about two or three weeks after the previous incident. Kieauna was in the laundry room looking for some clothes to wear to school the next day. She was on her knees going through clothes. Her testimony regarding this incident relates to count three of the indictment. The jury returned a verdict of not guilty on count three.

Kieauna testified that while she was in the laundry room, defendant entered the room and showed her a photograph of one of his former girlfriends. According to Kieauna, defendant then stated, "[T]he things I did to her is the things I am doing to you. I did those things to her because I loved her." (Tr. 52.) Defendant then left the laundry room and returned with a small jar of Vaseline. Kieauna testified that he then pulled down her pants and underwear and penetrated her vagina with his fingers. Again, Kieauna's testimony regarding this incident in the laundry room relates to count three upon which the jury returned a verdict of not guilty.

Kieauna testified that the next incident (seventh incident) occurred "weeks after" the last incident. (Tr. 56.) She testified that it occurred after Christmas after her eighth birthday, which was December 27, 1993. (Tr. 56.) She also testified that it occurred sometime in 1994. This incident relates to counts seven and eight of the indictment of which defendant stands convicted. This incident began in the daytime when only Kieauna and defendant were at home. Kieauna was on the downstairs couch, and defendant told her to go upstairs. Kieauna told him she did not want to go upstairs. Kieauna complied after defendant told her again. Defendant told Kieauna to go to her mother's bedroom and to sit on the bed. Defendant removed all of Kieauna's clothing, scooted her to the edge of the bed and then put his mouth on her vagina. After defendant stopped doing that, he removed

4

all of his clothing and penetrated her vagina with his penis. Kieauna testified that defendant was not wearing a condom and that when he pulled his penis out he ejaculated on the bed sheets. Kieauna, who was eight years old at the time, asked defendant "what was that," and defendant said, "this is the stuff that gets women pregnant." (Tr. 59.) After defendant put his clothing back on and told Kieauna to put her clothes back on, the telephone rang. It was Kieauna's mother. Defendant told Kieauna that she "better not say anything to anyone." *Id*. While Kieauna was speaking to her mother on the phone, defendant removed the bed sheets and took them downstairs to the laundry room and washed them. Defendant waited until the sheets were finished washing and then put them in the dryer. Kieauna did not tell her mother what had happened "[b]ecause I was afraid that she would be mad at me." (Tr. 60.) Again, this incident relates to counts seven and eight of the indictment, of which defendant stands convicted.

The next incident that Kieauna testified about was said to have occurred "about a month or two later" after the last incident. (Tr. 60.) This incident relates to counts eleven and twelve, upon which the jury returned not guilty verdicts. According to Kieauna, on this day, she was at home alone with defendant. She was already upstairs in her room. She went to her mother's bedroom to get something, not realizing that defendant was there. After telling her to take off her clothes, he then removed her shorts and underwear. Kieauna testified that he then put his mouth on her vagina. Kieauna further testified that defendant removed all of his clothing and penetrated her vagina with his penis. Again, this incident, testified to by Kieauna, relates to counts eleven and twelve of the indictment upon which the jury returned verdicts of not guilty.

Kieauna also testified about another incident that "occurred a few weeks later." (Tr. 62.) Kieauna was downstairs with her younger brother and sister. Her mother was not at home. Defendant told Kieauna to go upstairs. Kieauna ran and said, "I don't want to do this anymore." (Tr. 63.) According to Kieauna, she said, "Are you going to do this with my little sister because I don't want to do this anymore?" (Tr. 63.) Defendant got "very upset" and said, "no." According to Kieauna, "I told him that I was going to tell, but he was just like I don't care, no one was going to believe you." (Tr. 63-64.)

Kieauna further testified that defendant moved out of the apartment "about a month or two" after the last incident. "It had to be the beginning of the summer of '94." (Tr. 64.) According to Kieauna,

defendant continued to live in their apartment for awhile after he and her mother "stopped dating" because he "didn't have anywhere to go." *Id.*

In October of 1998, Kieauna told a friend about the incidents with defendant. Her friend told Kieauna that she should speak to her friend's mother. Her friend's mother told Kieauna that she must tell her own mother. Kieauna told her mother, and her mother became very upset and angry.

Telling her mother ultimately resulted in Kieauna speaking to someone from Franklin County Children Services, and then to the police department in 1999. Kieauna received counseling regarding the incidents with defendant.

The second and last witness called by the state was Gail Hornor. Hornor is a pediatric nurse practitioner employed in the Child Abuse Program at Children's Hospital. She had been so employed at the time of trial for about eight or nine years. Her duties involve performing examinations related to allegations of sexual abuse. She had performed over 4,000 such examinations prior to trial.

Hornor has a Bachelor's degree in nursing from Franklin University and a Masters degree in nursing from Wright State University. She completed a pediatric nurse practitioner program at The Ohio State University. She is licensed by the state of Ohio as a registered nurse and she holds a certificate from the state of Ohio to practice as a pediatric nurse practitioner.

Following the witness *voir dire*, which involved queries into Hornor's qualifications as an expert and her anticipated testimony before the jury, defense counsel moved *in limine* that the witness be excluded from testifying. (Tr. 109.) The court overruled defendant's motion.

As previously noted, Hornor examined Kieauna on August 18, 1999, when Kieauna was some thirteen years and eight months old. During the examination, Hornor examined the genitalia using a colposcope, which is a magnification device. Hornor also inserted a Foley catheter into the vagina, inserted a balloon, and pulled back so that she could visualize the hymen. Hornor observed two "abnormalities." One was a tear or transection of the hymen. The other was a thinning or attenuation of the base of the hymen. Both the attenuation and the transection were located at "6:00 o'clock" at the base of the hymen. (Tr. 121.) Those two findings are "consistent with some form of

6

penetrating injury." (Tr. 120.)

Hornor ruled out a "straddle injury" caused by a fall on a bicycle or something like that. (Tr. 121-122.) Hornor testified that a straddle injury involves a tear of the forchette, which is outside the hymen. The hymen is typically spared in a straddle-type injury.

Hornor photographed the hymen before and after insertion of the Foley and inflation of the balloon. Those two photographs were submitted as State's Exhibit No. 1 and were shown to the jury.

Hornor further testified that the tear or transection was "at least three to four weeks old to a number of years old" at the time of the examination. (Tr. 125.)

The defense called two witnesses, Mary White, who is Kieauna's mother, and Curtis Jones ("Jones"), an acquaintance of defendant.

White testified that she was a crack cocaine user in 1992. She also abused alcohol. She testified that she started "recovery" in June 1992, but there have been "relapses" involving alcohol and "some other drugs." (Tr. 170.)

She believes that her use of drugs and abuse of alcohol have affected her ability to remember events. *Id.*

White met defendant "in recovery at a meeting." (Tr. 151.) According to White, "it had to be '92." *Id.* She was living with her mother at the time. She recalled that she began dating defendant "[t]he year of 1992, somewhere around August." (Tr. 151.)

At trial, following the above testimony, the following exchange occurred:

Q. [DEFENSE COUNSEL]: And did you two ever get a place of your own?

A. [WHITE]: Yes, we did.

Q. [DEFENSE COUNSEL]: Prior to that you used to live with your mother with your children from the time you started dating Mr. Draughon until you got your own place. When was that?

A. [WHITE]: Which one are you talking about?

Q. [DEFENSE COUNSEL]: Your first place with Mr. Draughon.

A. [WHITE]: '93.

Q. [DEFENSE COUNSEL]: When was that in '93; do you remember?

A. [WHITE]: I just remember it was the summer. Well, it was in '92. Because I remember '93 distinctly because we went to an event together. That was the beginning of the year. So, I know in '92 we moved in together.

Q. [DEFENSE COUNSEL]: '92?

A. [WHITE]: '92, yes.

Q. [DEFENSE COUNSEL]: Now, do you recall what part of the time of the year, or what season of the year?

A. [WHITE]: It was warm when we moved.

Q. [DEFENSE COUNSEL]: Had you got an apartment with him?

A. [WHITE]: Yes.

Q. [DEFENSE COUNSEL]: That could be July, August, September?

A. [WHITE]: I don't remember. I just know it was warm.

Q. [DEFENSE COUNSEL]: How long did you two stay together?

A. [WHITE]: I would say a good six months.

* * *

Q. [DEFENSE COUNSEL]: Did it last until the first of the next year?

A. [WHITE]: Yes.
Q. [DEFENSE COUNSEL]: It did?

A. [WHITE]: Yes.

Q. [DEFENSE COUNSEL]: Did it last any longer than that?

8

A. [WHITE]: No, it didn't.

Q. [DEFENSE COUNSEL]: You know that?

A. [WHITE]: Yes.

Q. [DEFENSE COUNSEL]: So, he moved out around the first of the year after you guys got your apartment.

A. [WHITE]: Yes.

Q. [DEFENSE COUNSEL]: You never moved back?

A. [WHITE]: No.

Q. [DEFENSE COUNSEL]: Never moved back in?

A. [WHITE]: No.

(Tr. 151-153.)

White testified that defendant's name was put on the lease of the apartment that they moved into together. Defendant had a key to the apartment and could come and go as he pleased. Defendant had no regular working hours. He had a job selling vacuum cleaners and set his own hours.

During White's testimony, the following exchange occurred:

Q. [DEFENSE COUNSEL]: Did she ever discuss her relationships with boys?

A. [WHITE]: No.

[THE STATE]: I am going to object on hearsay.

THE COURT: Sustained.

* * *

Q. [DEFENSE COUNSEL]: Did you ever tell people at AA that your daughter was dating?

9

[THE STATE]: Objection, irrelevant.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, they opened the door.

THE COURT: Would you like to approach?

THEREUPON, the following proceedings were held outside the presence and hearing of the jury:

[DEFENSE COUNSEL]: It is my opinion they specifically asked this girl if she had dated anybody else, had sexual relations with anybody else since these things took place. I am asking whether or not this girl dated.

THE COURT: Doesn't that go into the shield situation, though?

[DEFENSE COUNSEL]: They opened that door.

[THE STATE]: I am sorry. To make the record clear from our position, we asked if she had any prior sexual offenses because of the origin of the injury. Subsequent to then is irrelevant. We never opened the door with this woman's conversation with anybody.

[DEFENSE COUNSEL]: We are generally discussing the dating. We not talking about sex acts, judge.

[THE STATE]: I never asked about dating.

THE COURT: I don't think you can start down that road. I am going to sustain the objection.

(Tr. 159, 161-162.)

Exhibit N to Return of Writ.

## II.  PROCEDURAL HISTORY

Petitioner was indicted by the January 7, 2000, term of the Franklin County grand jury on

two counts of gross sexual imposition, in violation of O.R.C. §2907.05, nine counts of rape, in violation of O.R.C. §2907.02, and two counts of felonious sexual penetration, in violation of O.R.C. §2907.12. Exhibit A to Return of Writ. While represented by counsel, petitioner proceeded to jury trial. On May 17, 2002, petitioner was found guilty of gross sexual imposition, and four counts of rape. Exhibits B and C to Return of Writ. He was sentenced to four terms of six to twenty-five years incarceration, such sentences to be served consecutively to each other, and one and one half years, such sentence to be served concurrently to the other sentences imposed. Exhibit C to Return of Writ. Represented by the same attorney, petitioner filed a timely appeal of his convictions to the Tenth District Court of Appeals. He asserted the following assignment of error:

> 1. The trial court erred in polling the jury on incorrect verdicts, thereby depriving appellant of his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

Exhibit E to Return of Writ. On May 29, 2003, the appellate court affirmed the judgment of the trial court. Exhibit G to Return of Writ. Proceeding *pro se*, petitioner filed a timely appeal of the appellate court's decision to the Ohio Supreme Court, in which he again raised the same claim. Exhibit I to Return of Writ. On September 23, 2004, the Ohio Supreme court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question. Exhibit K to Return of Writ. On August 18, 2003, petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). He asserted the ineffective assistance of appellate counsel due to his attorney's failure to raise the following issues on direct appeal:

> 1. An accused's due process rights are violated under Art. I Section 10 of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution when the trial court enters judgment against the accused, when the evidence was

11

insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.

2.  Whether appellate counsel was ineffective for failure to raise abuse of discretion of trial court for allowing inadmissible evidence and testimony by an expert witness for the exclusive purpose to bolster the alleged victim's testimony.

3.  Whether appellate counsel was ineffective for failure to raise the issue that the trial court unconstitutionally applied Ohio's rape shield law in this case that denied [sic] appellant's right to confrontation and in turn, due process of law and a fair trial by the unreasonable restriction on cross examination.

Exhibit L to Return of Writ.   On January 27, 2004, the appellate court denied petitioner's application.  Exhibit N to Return of Writ.  Petitioner filed a timely appeal of the appellate court's decision to the Ohio Supreme Court, in which he again asserted the same claims as were presented in his application to reopen the appeal.  Exhibits O and P to Return of Writ.  On May 26, 2004, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  Exhibit R to Return of Writ.

On September 4, 2004, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

1.  Petitioner's due process rights were violated under the Fifth and Fourteenth Amendments to the United States Constitution when the trial court erred in entering judgment against the accused in light of insufficient evidence to sustain a conviction.

2.  Petitioner was denied the effective assistance of appellate counsel, thus depriving him of the rights afforded by the Sixth and Fourteenth Amendments to the United States Constitution.

3.  The trial court erred in polling the jury on an incorrect verdict, thus depriving petitioner of his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States

12

Constitution.

It is the position of the respondent that all of petitioner's claims present an issue of state law, are procedurally defaulted or without merit.

### III.  CLAIM ONE - PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986).  "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule."  *Id.*  Second, the Court must determine whether the state courts actually enforced the state procedural sanction*. Id.*  Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose

review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis also applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

In claim one, petitioner asserts that the evidence is constitutionally insufficient to sustain his convictions.[1] This claim is readily apparent from the face of the record, and should have been raised on direct appeal, but was not. Further, petitioner may now no longer present such claim to the state courts under Ohio's doctrine of *res judicata. See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail,* 67 Ohio St.2d 16 (1981); *State v. Perry,* 10 Ohio St.2d 175 (1967). The state courts were never given the opportunity to enforce the procedural rule at issue due to the nature of petitioner's procedural default. The Court must next decide whether the procedural rule at issue constitutes an adequate and independent basis upon which to foreclose review of the petitioner's federal constitutional claim. This task requires the court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138.

Under this analysis, the procedural rule barring petitioner's claim of insufficiency of the evidence constitutes an adequate and independent state ground for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The requirement

---

[1] Petitioner also raises in claim one an issue regarding improper polling of the jury. This allegation will be considered, *infra,* with claim three.

14

that all available claims be asserted in the first appeal serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Additionally, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole, supra; State v. Ishmail, supra; State v. Perry, supra.*

This Court concludes that petitioner has waived his right to present claim one for federal habeas corpus review. Petitioner may still secure review of this claim on the merits if he demonstrates cause for his failure to follow state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. As cause for his procedural default of claim one, petitioner asserts the ineffective assistance of appellate counsel.

The ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts, and is not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). In petitioner's application to reopen the appeal, petitioner asserted that he was denied the effective assistance of appellate counsel due to his attorney's failure to raise on appeal a claim of insufficiency of evidence solely as to his convictions on rape as charged in counts seven and eight of the indictment. *See* Exhibit L to Return of Writ. Therefore, the ineffective assistance of appellate counsel may serve as cause solely for petitioner's allegation of insufficiency of the evidence for his convictions on rape as charged in counts seven and eight of the indictment. *See id.*

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must
> show that the deficient performance prejudiced the defense. This
> requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Strickland*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

The state appellate court rejected petitioner's claim of ineffective assistance of appellate

16

counsel as follows:

The law pertinent to defendant's first proposed assignment of error is succinctly set forth by this court in *State v. Norman*, Franklin App. No. 03AP-298, 2003-Ohio-7038, wherein this court states:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus.

Whether the evidence is legally sufficient is a question of law, not fact. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts ." *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. As such, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact. *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 79; *State v. Thomas* (1982), 70 Ohio St.2d 79, 434 N.E.2d 1356.

\*\*\*

Defendant's proposed first assignment of error focuses on some of the testimonial evidence that, if believed, would undermine the alleged time frame for the rapes that occurred with respect to counts seven and eight on which defendant stands convicted. As previously noted, counts seven and eight of the indictment were amended at trial so that the rapes are alleged to have occurred from on or about December 31, 1993, to January 31, 1994.

Defendant contends that the testimony of Kieauna's mother is in conflict with Kieauna's testimony as to when the rapes alleged in counts seven and eight occurred. White's testimony in that regard has been previously set forth. White initially remembered that she and defendant moved out of her mother's house and into their own place in the summer of 1993. (Tr. 152.) She then changed her recollection

17

of that event to the summer of 1992. She then said she remembered that it was 1993 "distinctly because we went to an event together." However, the "event" was never identified. She then reasserted that the event occurred in 1992. White later testified under cross-examination that she thinks her use of drugs and abuse of alcohol have affected her ability to recall events.

Needless to say, the jury was not required to give any weight to White's recollections as to when she and defendant moved out of her mother's house and into an apartment of their own.

Defendant also suggests that the testimony of Curtis Jones undermines the time frame for the rapes alleged in counts seven and eight. On direct examination by defense counsel, Jones testified that Johnny Walker ("Walker") was his cousin, and that defendant lived with Walker beginning the first of January 1994 until the end of the year. (Tr. 175.) According to the testimony, Walker died of AIDS in April 1995.

On cross-examination, Jones admitted that he never resided with Walker. Jones testified that he visited Walker "a lot," but he did not do so every night. (Tr. 179.) Jones spent the night at Walker's house "on a few occasions." (Tr. 176.) Jones testified that he was a friend of the defendant, but he did not know who defendant was dating at that time.

Clearly, Jones's testimony did not compel the jury to conclude that defendant could not have committed the rapes alleged in counts seven or eight.

In furtherance of his contention that the time frame alleged in counts seven and eight of the indictment, as amended, is not supported by the evidence, defendant suggests that it was Kieauna's testimony that the rapes "occurred sometime in the spring or summertime of 1994." (Defendant's memorandum, at 5.) We disagree with defendant's suggestion that the jury was compelled to conclude from Kieauna's testimony that the rapes alleged in counts seven and eight occurred in the spring or summer of 1994.

Kieauna's testimony at trial was presented as a series of incidents involving sexual contact with defendant. The time that a specific incident occurred is sometimes identified by Kieauna as having occurred within a specified period of time following the previous incident.

18

According to Kieauna's testimony, the first incident occurred during the summer of 1993 when she was upstairs watching television at her grandmother's house. On that occasion, defendant started rubbing her "butt."

The second incident occurred in October 1993 near Halloween. The second incident involved rape, of which defendant stands convicted.

The third incident was said to have occurred about two or three days after the second incident. This was the incident in which defendant is alleged to have moved Kieauna's hand to his penis under a blanket while they sat on a couch watching television.

The fourth incident was said to have occurred a few days after the third incident. The fourth incident is the one in which defendant is alleged to have anally penetrated Kieauna.

The fifth incident was said to have occurred "weeks later" when Kieauna was upstairs in the bathroom after taking a bath. Kieauna alleged that defendant digitally penetrated her vagina in the fifth incident. Kieauna remembers that this incident occurred around Christmas because she had received a gift from defendant that she really wanted.

The sixth incident was said to have occurred about two or three weeks after the previous incident and after Christmas. This incident allegedly occurred in the laundry room while Kieauna was looking for clothes to wear to school.

The next incident involves counts seven and eight, at issue here. This incident is said to have occurred "weeks after" the last incident, after Christmas and after Kieauna's eighth birthday on December 27, 1993, and sometime in 1994. This incident involved both rapes that occurred when defendant told Kieauna to go upstairs to her mother's bedroom. The rapes involved cunnilingus and vaginal intercourse. Kieauna remembered that defendant washed the bed sheets afterward. During Kieauna's testimony regarding the incident relating to counts seven and eight, the following exchange occurred:

Q. [THE STATE]: Do you remember what you were wearing?

A. [KIEAUNA]: It was getting a little bit warm out. So, I would say shorts and a shirt and underwear.
(Tr. 57.)

19

Perhaps the above exchange prompted defendant here to assert that: "Counts 7 & 8 allegedly occurred sometime in the spring or summertime of 1994." (Defendant's memorandum, at 5.) However, we do not believe that the above-noted exchange, read in the context of Kieauna's complete testimony, compels the conclusion that the incident relating to counts seven and eight occurred in the spring or summer of 1994, as defendant here asserts.

As previously noted, Kieauna specifically remembered that the fifth incident, involving digital penetration in the bathroom, occurred around Christmas of 1993. The sixth incident occurred in the laundry room two or three weeks after Christmas. The next incident, the one at issue here relating to counts seven and eight, was said to have occurred "weeks after" the last incident, which could place the incident in January 1994.

We recognize that Kieauna's testimony that she was wearing shorts due to warmer weather suggests that the incident may have occurred during a month other than January 1994. However, the jury was not compelled to place greater weight on Kieauna's testimony regarding the warmer weather than her testimony as to the sequencing of the incidents.

Taking Kieauna's testimony as a whole, we conclude that it supports a jury finding that the rapes involving counts seven and eight occurred during January 1994 as alleged in the amended indictment.

It is well-settled that, particularly in cases involving sexual misconduct with a child, the precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity. *State v. Daniel* (1994), 97 Ohio App.3d 548, 556, 647 N.E.2d 174, citing *State v. Barnecut* (1988), 44 Ohio App.3d 149, 542 N.E.2d 353. In many cases involving child sexual abuse, the victims are children of tender years who are simply unable to remember exact dates and times, particularly where the crimes involve a repeated course of conduct over an extended period of time. *State v. Mundy* (1994), 99 Ohio App.3d 275, 296, 650 N.E.2d 502, citing *Barnecut, supra. See, also, State v. Pressley*, Franklin App. No. 02AP-1354, 2003-Ohio-6069, at ¶ 59.

Based upon our review of the record, we conclude that defendant has failed to raise a genuine issue as to whether his appellate counsel was ineffective in failing to raise issues with respect to the sufficiency of the evidence....

20

Exhibit N to Return of Writ.

The factual findings of the state appellate court are presumed to be correct:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. §2254(e).  Further, the decision of the Ohio Court of Appeals is binding on this Court unless it is contrary to clearly established  federal law or was based on an unreasonable determination of the facts of record:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).  Petitioner has failed to establish that the state court's decision is so unreasonable as to justify federal habeas corpus relief.  *See Williams v. Taylor*, 529 U.S. 362 (2000).

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt.  *Jackson v. Virginia*, *supra*, 443 U.S. at 319.  To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution.  *Wright v. West*, 505 U.S. 277, 296 (1992)(citing *Jackson,* at 319).  The prosecution

21

is not affirmatively required to "rule out every hypothesis except that of guilt." *Id*. (quoting *Jackson*, at 326). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. (quoting *Jackson*, at 326). For example the trier of fact is entitled to disbelieve a defendant's uncorroborated and confused testimony, and even to discount a defendant's credibility on account of a prior felony conviction. *Id*.

Upon review of the record, and for the reasons discussed at length by the state appellate court, this Court likewise concludes that, when viewing all of the evidence in the light most favorable to the prosecution, the evidence is constitutionally sufficient to sustain petitioner's convictions on rape, as charged in counts seven and eight of the indictment. *Jackson v. Virginia, supra*. Petitioner therefore has failed to establish cause for his procedural default of claim one.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333. After review of the record, the Court does not deem this to be such a case.

## IV. CLAIM TWO

In claim two, petitioner asserts that he was denied the effective assistance of appellate counsel because his attorney failed to raise on appeal issues regarding the improper admission of testimony by Gail Horner, and the unconstitutionality of Ohio's rape shield law.

The state appellate court rejected these allegations of ineffective assistance of appellate counsel as follows:

22

We shall first address defendant's [claim] ... that ... appellate counsel was ineffective for failing to raise an issue regarding Ohio's rape shield law. We find that defendant has failed to raise a genuine issue as to whether defendant was deprived of effective assistance of counsel regarding Ohio's rape shield law.

R.C. 2907.02(D), Ohio's rape shield statute, states:

Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

In *State v. Gardner* (1979), 59 Ohio St.2d 14, 391 N.E.2d 337, the Supreme Court of Ohio rejected a constitutional challenge to the rape shield law on grounds that it denied the defendants their Sixth Amendment right to confrontation of witnesses and their right to a fair trial as secured by the Due Process Clause. The *Garnder* court stated:

Several legitimate state interests are advanced by the shield law. First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process. *Id*. at 17-18, 391 N.E.2d 337.

Defendant's issue centers primarily upon the trial court's ruling during the testimony of Kieauna's mother, Mary White. Defendant contends here that he called White to the stand "to testify that she had knowledge of her daughter's sexual activities prior to Gail Hornor's expert testimony." Presumably, defendant is contending that White was called to testify regarding Kieauna's sexual activities with boyfriends subsequent to the incidents with defendant and prior to her examination by Hornor on August 18, 1999, when Kieauna was almost thirteen years and eight months old.

23

The transcript reveals that, during White's testimony, defense counsel initially asked the witness, "Did she ever discuss her relationships with boys?" The state objected to the question on hearsay grounds, and the trial court sustained the objection. Thereafter, defense counsel asked, "Did you ever tell people at AA [Alcoholics Anonymous] that your daughter was dating?" The state objected on relevancy grounds, and the trial court sustained the objection. At that point, at a sidebar conference, defense counsel contended that the question regarding Kieauna's dating was proper because allegedly the state had previously inquired of Kieauna regarding "sexual relations with anybody else" subsequent to the incidents with defendant. The state responded that it had not "opened the door" by its questioning of Kieauna.

The transcript shows that the state was correct in stating that it had not "opened the door" for defense counsel's line of questioning into Kieauna's alleged dating. The transcript shows that on Kieauna's direct examination, the state asked her whether she had sexual conduct with any person other than the defendant up to the point when the incidents with defendant had occurred.

Kieauna's testimony that she had not had sexual contact with any other person up to the point when the incidents with defendant occurred did not "open the door" for defense counsel to introduce evidence regarding any sexual activity with any other person subsequent in time to the incidents with defendant.

Ohio's rape shield statute clearly precluded defense counsel from attempting to present evidence of Kieauna's alleged sexual activity with someone other than defendant subsequent to the incidents with defendant when Kieauna was seven or eight years old.

Accordingly, we find that defendant has failed to raise a genuine issue as to whether his appellate counsel was ineffective in failing to raise an issue with respect to the rape shield statute.

We shall next address defendant's second proposed assignment of error, which alleges that appellate counsel was ineffective for failing to raise as error the trial court's denial of defendant's motion *in limine*, which requested the exclusion of the testimony of Gail Hornor.

In support of his second proposed assignment of error, defendant cites *State v. Price* (1992), 80 Ohio App.3d 35, 608 N.E.2d 818. In

Price, the defendant, Glenn Price ("Price") was convicted on a jury verdict finding him guilty of rape, attempted corruption of a minor, and gross sexual imposition, all concerning his 15-year-old stepdaughter. Over Price's objection, the trial court permitted Price's stepson, the brother of the prosecution witness, to testify generally that on other unspecified occasions, he had seen Price having sexual relations with another older stepdaughter. The instances of sexual conduct and contact with the older stepdaughter described by the stepson did not involve the prosecution witness. The trial court admitted the challenged testimony as evidence of other acts, citing R.C. 2945.59. The older stepdaughter did not testify at trial.

In *Price*, the court held that the testimony of the victim's brother concerning alleged acts between Price and the victim's sister was obviously intended to prove Price's character in order to show that he acted in conformity therewith concerning the crimes of which he was convicted. Such testimony was clearly inadmissible for any purpose and was prejudicial to Price.

Price assigned as error the trial court's failure to exclude the testimony of the prosecution's expert, Julie Sargel ("Sargel"), who was a "Children's Services worker." Sargel testified concerning patterns found in child sexual abuse and the symptoms of post-traumatic stress syndrome. Price did not challenge Sargel's qualifications as an expert. The Price court agreed that the purpose of Sargel's testimony was to strengthen the testimony of the prosecution's witnesses.

Sargel did not reach any conclusion during her testimony concerning whether or not the victim had been sexually abused. The *Price* court quoted Evid.R. 702 relating to the testimony of experts.

The *Price* court concluded:

* * * Absent any evidence in the record disclosing a legitimate purpose for this testimony, we can only presume that it was introduced for the purpose of bolstering the testimony of the victim and her brother and, therefore, such testimony was inadmissible.

*Id.* at 42, 608 N.E.2d 818.

The scenario in *Price* with respect to Sargel's testimony as an expert witness is clearly inapposite to the instant case involving the testimony of Gail Hornor.

25

Evid.R. 702 states in part:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; * * *[.]

Hornor testified as a medical expert regarding her clinical observations and findings during her examination of Kieauna. She testified that there was evidence of a tear or transection of the hymen and also evidence of thinning or an attenuation of the hymen. She testified that those two findings are consistent with some form of penetrating injury. Hornor ruled out a straddle type of injury. She photographed the injury during the Foley procedure. She also opined that the injury was at least three to four weeks old and that it could have been a number of years old.

Hornor's testimony as a medical expert relates to matters beyond the knowledge or experience possessed by lay persons under Evid.R. 702. Hornor's testimony is unlike Sargel's testimony in the *Price* case. Sargel was not a medical expert testifying about clinical findings during a medical examination. Sargel was a "Children's Services worker" whose testimony could not be admitted under Evid.R. 702. The purpose of Sargel's testimony, unlike the situation with Hornor here, was to bolster the testimony of the prosecution's witnesses.

Accordingly, defendant's reliance upon *Price* is misplaced. Price does not support defendant's contention that the trial court erred in permitting Hornor to testify.

We find to be instructive here the following pronouncement from the Sixth District Court of Appeals in *State v. Esmond*, Lucas App. No. L-01-1400, 2002-Ohio-2360, at ¶ 23:

A *Boston* [*State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220.] problem arises when an expert witness attempts to invade the jury's factfinding province by offering an opinion as to another witness's credibility. *State v. Yarber* (1995), 102 Ohio App.3d 185, 195, 656 N.E.2d 1322. We do not, however, perceive any such incursion when an expert voices his or her opinion that observable data is consistent with a reported cause. Here, the physician testified that his examination of the victim revealed physical characteristics consistent with a blunt object being repeatedly inserted into her

26

> vagina, which was what the victim said had occurred. This is a clinical observation, not a comment on the victim's veracity. *Id.*
>
> Having reviewed the testimony of Gail Hornor as transcribed in the record, we do not perceive a *Boston* problem with her testimony.
>
> Accordingly, we find that defendant has failed to raise a genuine issue as to whether his appellate counsel was ineffective in failing to raise an issue with respect to the testimony of Gail Hornor.

Exhibit N to Return of Writ.  Again, the decision of the state appellate court is entitled to a presumption of correctness pursuant to 28 U.S.C. §2254(d), (e), and petitioner has failed to establish any reason to disturb that decision here.  *Williams v. Taylor, supra.*

Petitioner has failed to establish the ineffective assistance of counsel under *Strickland* based upon counsel's failure to raise an issue regarding improper admission of testimony by Horner, or application of Ohio's rape shield law.  As noted by the state appellate court, the Ohio Supreme Court has affirmed the constitutionality of Ohio's rape shield law.  *See State v. Gardner, supra.*  Further, contrary to petitioner's allegation here, the trial court's refusal to permit petitioner to cross examine Mary White, the victim's mother, regarding her daughter's sexual activity subsequent to the alleged sexual assaults by petitioner did not deprive petitioner of his right to present a defense or cross-examine witnesses. [I]t is within the sound discretion of the trial judge to limit the scope of cross-examination.  *United States v. Christian*, 786 F.2d 203, 213 (6th Cir. 1986); *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000), citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

> This includes discretion to impose limits based on concerns about harassment, prejudice, confusion of the issues, witness safety, or interrogation that is repetitive or only marginally relevant. *See id.*; *King v. Trippett,* 192 F.3d 517, 524 (6th Cir.1999)(citing *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431). In this way, the Confrontation Clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d
15 (1985)(emphasis in original).

*Boggs v. Collins, supra,* 226 F.3d at 736-37.   Generally, the Constitution protects a criminal

defendant's right to cross examine a witness regarding bias and motive to testify, but does not

protect  general attacks on credibility. *Id*., at 736-37; *see also id*, at 738-39 (for discussion of cases

concluding that there is no Confrontation Clause violation where trial court prohibits admission of

rape victims' prior false accusations.)  Evidence of the victim's sexual activity does not meet this

standard.  Further, Horner was cross examined regarding the possibility that the victim had engaged

in consensual sex, which might have accounted for Horner's physical findings.  *Transcript*, at 132-

133.

For these reasons, and for the reasons discussed by the state appellate court, the Magistrate

Judge concludes that claim two is without merit.

## V.  CLAIM THREE

In claim three, petitioner asserts that he was denied a fair trial because the trial court erred

when polling the jury.  This claim presents an issue of state law that is not appropriate for federal

habeas corpus review.

A federal court may review a state prisoner's habeas petition only on the grounds that the

challenged confinement is in violation of the Constitution, laws or treaties of the United States.  28

U.S.C. §2254(a).  A federal court may not issue a writ of habeas corpus "on the basis of a perceived

error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984): *Smith v. Sowders*, 848 F.2d 735, 738

(6th Cir. 1988).  A federal habeas court does not function as an additional state appellate court

reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th

Cir. 1988).  "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence

and procedure'" in considering a habeas petition.  *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).  Only where the error resulted in the denial of fundamental fairness will habeas relief be granted.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).  Such are not the circumstances here.

Further, to the extent that petitioner intends to raise a federal constitutional issue here, such claim was not fairly presented to the state courts.  In order to exhaust available state remedies, a petitioner must first fairly present the substance of his federal habeas corpus claims to the state courts.  *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  "The state courts must be provided with a fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's constitutional claims."  *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir. 1986).  Petitioner does not fairly present his claim simply because the necessary facts supporting a federal constitutional claim are present or because the constitutional claim appears to be self-evident.  *Haggins v. Warden*, 715 F.2d 1050, 1054 (6th Cir. 1983)(citing *Harless*, 459 U.S. at 6).  "A petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions employing Constitutional analysis, or state decisions employing Constitutional analysis in similar fact patterns."  *Levine v. Trovik*, 986 F.2d 1506, 1515 (6th Cir. 1993)(citing *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)).  Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law."  *Franklin*, 811 F.2d at 326; *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir. 1984).  Petitioner, however, need not "cite book and verse on the federal constitution."  *Picard,* 404 U.S. at 277 (quoting *Daugharty v. Gladden*, 257 F.2d 750, 7758 (9th Cir. 1960)).  The Sixth Circuit has strictly followed the requirement that petitioner fairly present his federal constitutional claims to the state courts as a

precondition to federal habeas review.  *Weaver v. Foltz*, 888 F.2d 1097, 1098 (6th Cir. 1989).

Review of the record indicates that petitioner cited only state law and state statute in presenting claim three to the state courts.  Further, petitioner has failed to establish cause or prejudice for the failure.  Any federal constitutional issue, therefore, is waived.

## VI.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matt er to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

s/Mark R. Abel
United States Magistrate Judge

30